## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 26 2017, 9:08 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Nancy A. McCaslin
McCaslin & McCaslin
Elkhart, Indiana

ATTORNEY FOR APPELLEES

Laura M. Longstreet
Longstreet Law, LLC
South Bend, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In Re the Matter of
Patricia Rumfelt,

*Appellant-Petitioner*,

v.

Alicia Hollars and Harry Arndt,

*Appellees-Respondents*.

October 26, 2017

Court of Appeals Case No.
No. 20A03-1703-MI-536

Appeal from the Elkhart Superior Court

The Honorable David C. Bonfiglio, Judge

Trial Court Cause No.
20D06-1510-MI-309

**Brown, Judge.**

[1] Patricia Rumfelt appeals the trial court's denial of her petition for grandparent visitation. Rumfelt raises one issue which we revise and restate as whether the trial court abused its discretion in denying her request for grandparent visitation. A.B. ("Mother") requests attorney fees. We affirm and deny Mother's request for attorney fees.

## Facts and Procedural History

[2] On October 22, 2015, Rumfelt filed a petition for grandparent visitation stating that she is the paternal grandmother of A.A. ("Child") and that Mother is the natural and custodial mother of Child. Rumfelt further alleged that Child was born out of wedlock and her father's paternity has been established, that she had a meaningful relationship with Child but that Mother has prohibited further contact, and that she believes it is in the best interest of Child to have a relationship with her and with father's side of the family. Following a hearing, the court appointed a guardian ad litem (the "GAL"). On August 1, 2016, Mother filed a motion requesting the court to exclude evidence related to Child's relationship with her paternal great-aunt ("Great-Aunt"), and the following day the court entered an order stating that it would determine admissibility of evidence at trial.

[3] On March 8, 2016, the GAL filed a report with the court stating that Child was ten years old, that Child's father has had no contact with Child for eight years, and that despite this Child has been a guest in the home of Great-Aunt. The GAL's report provides that "[t]he petition filed under Patricia Rumfelt's name

was actually initiated by" Great-Aunt; that, while Rumfelt would have time with Child, Child would mainly be with Great-Aunt and Child's paternal great-grandmother ("Paternal Great-Grandmother") who reside in the same home; and that Child did not know Rumfelt was her grandmother until recently. Appellant's Appendix Volume 2 at 18. The report provides that Mother made a decision to take Child to a specialist in Fort Wayne for treatment; Child was very ill and needed blood transfusions and eventually required surgery at Riley hospital; and Mother stated Great-Aunt was upset with her for deciding to take Child to Fort Wayne and showed up at Mother's home to tell her she thought Mother was being ridiculous by taking Child to Fort Wayne. The report further provides that early one morning in September 2015 Mother received a call from a staff person at the South Bend office wanting to talk further about a conversation she and Mother had engaged in earlier that morning; Mother informed the staff that she had not talked to anyone in their office but the staff insisted they had talked to her; finally it was determined that Great-Aunt had contacted the doctor's office and either told them that she was Mother or allowed them to believe she was Mother; and in any event Great-Aunt maintains that she was the one who had Child's medical records transferred to the Fort Wayne doctor.

[4] The GAL's report states that, around the same time, Child received a text message from Great-Aunt stating that Mother was not taking good care of her and Child should live with Great-Aunt, and at this point Mother decided that Great-Aunt had overstepped her boundaries on more than one occasion and

told that Child was too sick to come to her home for weekend visits because of the needed blood transfusions. The report also states that Mother, concerned about Great-Aunt's interference, instructed hospital staff that the only allowed visitors were Mother, her husband, and Child's maternal grandparents, that soon after this Great-Aunt told Child that she was going to take Mother to court so she could be with Child, and at that point Mother ended all contact. The report states that Child had surgery, Child is well into recovery and doing well physically, Child expresses that she does not want to see Great-Aunt because she is upset that Great-Aunt "took mom to Court," and "[f]rom [Child's] perspective [Great-Aunt] got [Mother] in trouble." *Id.* at 19.

[5]     The GAL's report further states in her report that Mother has been married to her husband for seven years and they have two other children, in her interview with Mother she found Mother to be a responsible and sensible parent, Mother sought out the best medical treatment for Child and followed the doctor's advice regarding care and treatment, and that she had no reason to believe that Mother was anything less than attentive and responsive when it came to Child's medical needs. The report states that Great-Aunt did overstep when she contacted Child's doctor and must have in some way indicated she was Child's parent or the staff would not have spoken to her due to HIPPA regulations, and that Great-Aunt caused Child to be emotionally upset by implying that Mother was not taking care of her properly and was taking Mother to court. The GAL states that, in her opinion, Mother is doing what she believes to be in Child's best interest; that encouraging Child to have a relationship with her biological

father's family, even though her father was not active in her life, shows Mother is placing Child's needs first; that she had no indication there was any vindictiveness or malice in Mother's decision to stop contact; that Mother said if Child wants contact she will do what she believes best at that time but, for now, Child still harbors sad and angry feelings toward Great-Aunt and does not want to see her.

[6] On November 7, 2016, Mother filed a motion to dismiss under Ind. Trial Rule 12(B)(6) arguing that Rumfelt is not a grandparent under Ind. Code § 31-9-2-77 as an adoption was finalized on October 27, 2016, under cause number 20D01-1609-AD-75 ("Cause No. 75"), terminating the parental rights of Child's father.[1] The chronological case summary shows that Rumfelt filed an objection on the following day. Following a hearing, the court issued an order on December 1, 2016, denying Mother's motion to dismiss. The court's order stated that Rumfelt's petition for grandparent visitation was filed on October 22, 2015, that Mother and her husband filed an adoption proceeding on September 6, 2016, that the adoption decree was issued on November 1, 2016, and that Mother knew the adoption was pending and that the visitation matter would not be resolved until after the adoption was approved.

[7] On January 20, 2017, the court held an evidentiary hearing on Rumfelt's petition. At the hearing, Rumfelt indicated that she had an issue with her

---

[1] The trial court took judicial notice of Cause No. 75.

ability to hear and testified: "I was born with a RH factor with my parents and it did some brain damage. And all it did was my hearing loss. And the speech just happens. It comes up whenever it feels like it, I guess." Transcript at 33. She indicated she has learned to read lips and has about twenty percent hearing loss. When asked how long her son and Mother were together after Child was born, Rumfelt answered "[u]ntil she was two years old" and "I'm not really sure." *Id.* at 41. She testified that, when Child was first born, she would babysit Child. When asked how often she would babysit, Rumfelt answered "[j]ust varies; when they needed me, mostly." *Id.* at 42. Rumfelt testified that Great-Aunt and Paternal Great-Grandmother lived together. When asked how the split between her son and Mother affected her relationship with Mother, Rumfelt answered "[n]ot really sure why; it went sour." *Id.* at 43. She indicated her son moved to Fort Wayne, where he lived until two years ago, and that now he is in Washington State. She testified that her son saw Mother and Child when Child was around two years of age and that he has had no contact with Child since then. When asked if she attempted to contact Mother to see Child, Rumfelt answered that one night she went to Mother's apartment because she knew that Child was at Paternal Great-Grandmother's house and that Mother would not answer the door and that she would call her and Mother would not answer the phone, and that "then I just decided she didn't want to talk to me." *Id.* at 45.

[8]     Rumfelt indicated that, after her son left, it was two or three years before she saw Child again, that during this time Great-Aunt saw Child, that Mother told

Great-Aunt that Rumfelt was not allowed to be there, and "I just went along with it." *Id.* at 46. She testified she started to see Child again when she was five or six years old, that Child was eleven years old now, and that the last time she saw Child was in August of 2015. When asked "[n]ow, [Child] has some medical problems, is that correct," Rumfelt answered "I presume, that's what they tell me, I'm trying to find out what it is." *Id.* at 51. When asked about the GAL's statement that "this really isn't about you, it's your sister," Rumfelt replied "[w]ell, I think [Great-Aunt] overstepped her boundaries a little bit." *Id.* at 52. Rumfelt indicated that Child was about or less than two years old in December of 2007 and that in the summer of 2007 Child was at her house, Child crawled into her dog's cage, the dog followed her in, and she took a photograph of Child in the cage. She indicated that Mother did not want her to have Child by herself and she did not have much of a relationship with Child until she was approximately five or six years old, that she then began to visit with Child at Great-Aunt and Paternal Great-Grandmother's house and saw Child "[m]aybe twice a month," and that she never reached out to Mother to request time with Child from the time Child was five years old until Child was about to have surgery. *Id.* at 64.

[9]     Great-Aunt indicated that she took care of Child while Mother worked before Mother and Child's father split, that after they split Child would visit her on the weekends, and that Mother told her not to leave Child alone with Rumfelt. Great-Aunt testified she went to the hospital after Child had a blood transfusion and that Mother was very distant. She stated that she contacted the office of

Child's doctor in South Bend and asked that Child's records be transferred to Child's new doctor in Fort Wayne, that she called the South Bend doctor again a week later to follow up, and that she never told the office that she was Mother. When asked how she found out the hospital where Child was having her blood transfusion, Great-Aunt replied that she called the hospital to see if Child was registered and that Mother did not tell her the location of the transfusion. When asked whether she or Rumfelt had the better relationship with Child, Great-Aunt testified "[p]robably me." *Id.* at 105.

[10] The GAL testified that, when she did her initial home visit at Rumfelt's home, Great-Aunt was present and informed her that she and Paternal Great-Grandmother were the ones who were involved with Child for the vast majority of the time she would visit. The GAL stated that the majority of the conversation was with Great-Aunt and that Rumfelt said very little. The GAL testified that she had seen nothing to indicate that Mother is not an attentive, caring parent and that she met and spoke with Mother's husband and has no issues with him. The GAL testified she "came away with the understanding that [Great-Aunt] was the primary person [Child] spent time with," "that's just the way it was," "I know that [Mother] had some issues with [Rumfelt] [and] was concerned about [Child] being alone with [Rumfelt]," "I think part of that was to accommodate . . . because of [Mother's] concerns," "but it was clear that the visits were between [Great-Aunt] and [Child] and they . . . would spend some time with [Rumfelt]." *Id.* at 123.

The GAL further testified she met with Child three or four times and had conversations with her outside the presence of Mother and that Child is very articulate and clear about how she feels and what she likes and does not like. The GAL indicated that Great-Aunt affirmatively told her that she initiated this action in Rumfelt's name.

The GAL stated that Child's position from the first meeting with her is that she loves Mother, that Mother took good care of her, that she did not like it when Great-Aunt said that Mother did not take good care of her and Child should come live with her, and that was really disturbing to Child. The GAL testified that her impression is that Mother is trying to protect Child and that Child does not need to be dealing with the conflict between the adults. She stated that the last time she met with Child, Child's position was unchanged, that "in her mind, [Great-Aunt] got mom in trouble" and "took mom to court," that Child was upset because she loves Mother and Mother takes care of her, and that Child was offended that somebody would criticize Mother in that way. *Id.* at 134-135. The GAL also testified that "I think when [Child] talks about Auntie, grandma, you know, she kind of, she does kind of lump them all together, but the primary relationship is auntie." *Id.* at 135. She indicated that Child is not expressing a desire to see and spend time with Great-Aunt. She also indicated that, when she first discussed visitation with Great-Aunt in August, Child was hesitant and not thrilled but indicated that she could be okay with that, but when the GAL brought it up again later, Child said "No. No" and that Child is

worried about Great-Aunt's statement that Child should live with her. *Id.* at 136.

[13]    The GAL also noted that Child is intelligent and articulate that her feelings need to be heard and seriously considered, and that she believes Mother is doing what she believes to be best for Child. The GAL also indicated that Rumfelt had ample opportunity to contact her and to discuss her feeling in this case. When asked her recommendation, the GAL responded that she does not want Child to be in a position where it is implied or outright stated that Mother has created problems and that is "just not true" in her opinion, that she thinks Great-Aunt owes Child and Mother an apology, and that she thinks Mother is the best one to decide. *Id.* at 139.

[14]    Mother's husband testified about his relationship with Mother and Child and Mother's care for Child over the years, he had been married to Mother for over seven years, he met Child when she was eighteen months old and regarded her as his daughter, he had no reason to believe Mother has acted in a way that is not in Child's best interest, and that he had been introduced to Rumfelt but that was the extent of it.

[15]    Mother testified that Child was eleven years old, that she had not heard from Child's father since December of 2007, and that she personally did not have much of a relationship with Rumfelt except that she was her former boyfriend's mother. When asked about Rumfelt's testimony that she came to her apartment to ask about visitation with Child, Mother indicated that she was not

aware of that occurring and that, with respect to the timeframe Rumfelt referenced, Mother was not living there and was living at her now brother-in-law's house with her current husband. Mother testified that there was an instance in the summer of 2007 when she went to pick up Child from Rumfelt's house and, when she pulled up, she walked into the garage and Child was in a car alone, the windows were rolled up, and Child was sleeping in a car seat.

[16] Mother testified that, after she and Child's father split, she expressed to Great-Aunt that she did not want Child to be alone with Rumfelt, that Rumfelt had never tried to contact her until this court proceeding, and that she did not hear from Rumfelt directly for about eight years. Mother indicated that Child would see Great-Aunt on weekends, that to her knowledge Rumfelt did not see Child on a regular basis, and that she discovered Rumfelt was at Great-Aunt's house when Child visited because Child told Mother when she returned home. Mother indicated that Child learned that Rumfelt was her grandmother in October 2015, that she received a phone call that she was going to court and then it was necessary to explain to Child that Rumfelt was her paternal grandmother, and that Child had referred to Rumfelt as "Patty." *Id.* at 178.

[17] Mother stated that Child became ill and had several tests in February 2015, a procedure was scheduled in South Bend, Great-Aunt invited another person who was a priest or pastor to be present, and Child was not thrilled that person was present. She testified there were issues with medications and Child's symptoms and that communication with the doctor's office was horrible, she asked Child's pediatrician for a referral to another doctor, she was referred to a

specialist in Fort Wayne, the doctor in Fort Wayne was "right on top of things" and helped with Child's medications, and at one point Child traveled to Fort Wayne every two weeks while a medicine was administered intravenously. *Id.* at 181.

[18] Mother testified that after she started to take Child to Fort Wayne, Great-Aunt stopped by her house unannounced and told her that it was an inconvenience for Mother to take Child there. Mother stated that the day Child needed a blood transfusion she was not in the hospital room for five minutes before Great-Aunt arrived and that it was a concern to her that Great-Aunt obtained the information from the hospital that Child was there.

[19] Mother testified that, the following week, she found the text message that Great-Aunt had sent to Child stating that Mother was not taking care of her properly and that she became upset, and that, during the week after her second transfusion, Child received a phone call that Great-Aunt was taking Mother to court. *Id.* at 184. Mother testified she does not believe that it is in Child's interest for the court to enforce a visitation schedule between Child and Rumfelt, that she felt Child is "mature enough . . . to know where she wants to be," that she does not want to force Child to do anything she does not want to do, and that if Child asked "if she can go over there, if she can see them, then I would. I would definitely say then yes she can see them." *Id.* at 187. When asked if Child has been asking that, Mother answered in the negative.

[20] Mother testified she has had the same phone number for eight years and Rumfelt had never contacted her until May 2016, immediately after the first court hearing, in which Rumfelt asked for visitation and she replied "No." Mother testified she was very intimidated by Great-Aunt, that "hence the fact I could hardly ever say, 'No' to her," and that her "anxiety would be so bad around her." *Id.* at 192. When asked why she told Great-Aunt not to allow Rumfelt to be alone with Child, Mother answered "I don't feel that she is competent to . . . make sure that she is safe . . . after finding her in . . . the car in the garage with the windows up sleeping" and stated that Child was less than two years old at that time. *Id.* at 195.

[21] Mother's mother testified regarding her observations of Mother and Child and that to her knowledge Child has no relationship with Rumfelt. Mother's father also testified regarding his observations of Mother and Child, that as far as he knew Child had no relationship with Rumfelt, and that he would describe the relationship between Mother and Child as strong. The court took the matter under advisement. The parties submitted written closing arguments to the court.

[22] On February 10, 2017, the trial court entered an order denying Rumfelt visitation. The order provides in part:

> Biological father, petitioner's son, had little contact with the child for many years and his parental rights were terminated when mother's husband adopted the child under [Cause No. 75].

Based upon the manner and content of Patricia Rumfelt's testimony in this proceeding, she appears to suffer from impairments from what she described as "brain damage at birth." She has had some contact over the years with [Child]. Her sister, [Great-Aunt], has spent substantially more time with the child than [Rumfelt]. [Rumfelt's] more recent contacts with the child have been when the child was in [Great-Aunt's] care. Until the summer of 2015, the child did not know [Rumfelt] was her grandmother, but just another family member she visited with when she was at [Great-Aunt's] home. The child found some photographs in mother's home and figured out that [Rumfelt] was her father's mother.

[Child] has suffered serious medical issues and [Great-Aunt] has attempted to interfere with the manner of treatment she was receiving. This resulted in [Great-Aunt] texting [Child] telling her that [Mother] was not taking good care of her and that [Child] should live with her. [Child] to this day harbors resentment toward [Great-Aunt] for these actions and she harbors resentment toward [Great-Aunt] for these proceedings. [Child] does not want to see her. [Child] does not see [Rumfelt] as the main character in this drama, but rather [Great-Aunt] as the main character. [Child's] responses concerning grandparent visitation were always responded to by her as to what [Great-Aunt] was doing. The GAL is of the same belief which appears to be an accurate understanding of the situation. "The petition filed under Patricia Rumfelt's name was actually initiated by [Great-Aunt]." See: GAL Report filed in this case March 8, 2016, as well as, testified to during these proceedings.

Grandparent has not shown by a preponderance of the evidence that it is in [Child's] best interest to have grandparent visitation. The court finds [Child] has emotional distress concerning continued contact with her biological father's family including [Rumfelt] at this time in her life.

Mother has consistently acted in [Child's] best interest and she does not have any vindictiveness or malice toward [Great-Aunt]

or [Rumfelt]. She understands the need for [Child] to continue her connection to her father's biological family when [Child] is ready and desires that contact. [Child] has been through much emotional distress from learning at 10 years of age who, in fact, is her biological father and who is her biological paternal grandmother. Furthermore, she has gone through major health problems resulting in major surgery, as well as, feeling threatened, by [Great-Aunt], to be taken away from the only consistent family she has known; that is, [Mother]. Although [Great-Aunt] assisted mother in prior years with care of [Child] those ties have been broken over the years by the events that have occurred. Mother will act in [Child's] best interest. Further, [Child] does not want this contact because she is resentful of [Great-Aunt's] interference and she does not see her paternal grandmother as a major factor in her life. When she thinks of her father's family, she thinks of [Great-Aunt]. The court finds insufficient evidence to substitute its judgment for mother's judg[e]ment in regard to [Child's] contact with her father's family.

Appellant's Appendix at 11-12.

## *Discussion*

[23] The issue is whether the trial court abused its discretion in denying Rumfelt's petition for grandparent visitation. Grandparent visitation is governed by Ind. Code §§ 31-17-5. Consistent with Ind. Code § 31-17-5-6,[2] the trial court's order denying Rumfelt's petition for grandparent visitation includes findings and conclusions. This Court applies the well-established Indiana Trial Rule 52

---

[2] Ind. Code § 31-17-5-6 provides: "Upon hearing evidence in support of and opposition to a petition filed under this chapter, the court shall enter a decree setting forth the court's findings and conclusions."

standard of review: first, we consider whether the evidence supports the findings; second, we determine whether the findings support the judgment. *In re Visitation of K.M.*, 42 N.E.3d 572, 575-576 (Ind. Ct. App. 2015). We shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses. *Id.* at 576. We will find clear error if there is no evidence supporting the findings or the findings fail to support the judgment or if the trial court applies the wrong legal standard to properly found facts. *Id.* Additionally, our review is conducted with a preference for granting latitude and deference to our trial judges in family law matters. *In re Visitation of L-A.D.W.*, 38 N.E.3d 993, 997 (Ind. 2015). Because Rumfelt appeals a negative judgment, she must show that the evidence points unerringly to a conclusion different from that reached by the trier of fact. *See Wilder-Newland v. Kessinger*, 967 N.E.2d 558, 560 (Ind. Ct. App. 2012), *trans. denied*.

[24] Rumfelt asserts that, while the trial court's finding regarding her brain damage at birth is factually correct because she has hearing loss attributable to brain damage at birth, the evidence does not support the implication that she suffers an intellectual impairment. She argues that the evidence does not support the finding that Mother understands the need for Child to continue her connection to her father's biological family when she is ready and desires that contact, that Child did not testify, that it was Mother who ended all contacts with the biological family of Child's father, and that Rumfelt did not want to adopt Child or take her from Mother. She further argues that Great-Aunt's

involvement with Child and possible overstepping of her boundaries should not have been relevant in the decision as to whether Rumfelt should have visitation with Child. She contends that Mother denied her the opportunity to visit with Child, she did not know why she was denied visitation, the record does not reflect that Child was ever injured or harmed while visiting with her, that although Child had visited with her, Great-Aunt, and Paternal Great-Grandmother in the past, Mother suddenly denied visitation shortly after Child learned about her biological father, and that she had visitation with Child during the early years of Child's life.

[25] Mother responds that Child has not had a significant relationship with Rumfelt, that Child sees Rumfelt only occasionally when Child is at the home of Great-Aunt and Paternal Great-Grandmother, that Rumfelt has not had Child by herself for eight years, and that during that period Rumfelt never contacted Mother about why she was not allowed to have Child without supervision. Mother asserts there is no doubt that she is a fit parent and that she acted in Child's best interest in arranging medical care for Child. Mother also argues that Rumfelt is not entitled to visitation under Ind. Code §§ 31-17-5 because she no longer qualifies as a grandparent and, at the time of Child's adoption by Mother's husband, Rumfelt did not have any already-established right to visitation with Child.

[26] Ind. Code § 31-17-5-1 provides that "[a] child's grandparent may seek visitation rights" under certain circumstances including if the child was born out of

wedlock.[3]  Ind. Code § 31-17-5-2 provides in part that the court may grant visitation rights "if the court determines that visitation rights are in the best interests of the child" and that, in determining the best interests of the child, the court may consider whether a grandparent has had or has attempted to have meaningful contact with the child.  Ind. Code § 31-17-5-9 provides in part that visitation rights provided for in section 1 survive the adoption of the child by a stepparent.  "Maternal or paternal grandparent," for purposes of Ind. Code §§ 31-17-5, includes the adoptive parent of the child's parent, the parent of the child's adoptive parent, and the parent of the child's parent.  Ind. Code § 31-9-2-77.

[27]  Grandparent visitation must be balanced with the fact that the natural parents have a fundamental constitutional right to direct their children's upbringing without undue governmental interference.  *In re Visitation of M.L.B.*, 983 N.E.2d 583, 586 (Ind. 2013).  To protect this fundamental right, a trial court's order on grandparent visitation must address the following factors:

> (1) a presumption that a fit parent's decision about grandparent visitation is in the child's best interests (thus placing the burden of proof on the petitioning grandparents);
>
> (2) the "special weight" that must therefore be given to a fit parent's decision regarding nonparental visitation (thus

---

[3] Ind. Code § 31-17-5-1(b) provides that a court may not grant visitation rights to a paternal grandparent of a child who is born out of wedlock if the child's father has not established paternity in relation to the child.

establishing a heightened standard of proof by which a grandparent must rebut the presumption);

(3) "some weight" given to whether a parent has agreed to some visitation or denied it entirely (since a denial means the very existence of a child-grandparent relationship is at stake, while the question otherwise is merely how much visitation is appropriate); and

(4) whether the petitioning grandparent has established that visitation is in the child's best interests.

*Id.* (citations omitted). "The first three required factors implement the constitutionally protected right of fit parents to make child rearing decisions, and reflect the significant burden of proof grandparents must carry to override those decisions." *Id.* at 587. As for the fourth factor, in determining the child's best interests, the court may consider whether a grandparent has had or has attempted to have meaningful contact with the child. *In re Visitation of K.M.*, 42 N.E.3d 572, 577 (Ind. Ct. App. 2015) (citing Ind. Code § 31-17-5-2(b)). A child's best interests do not necessarily override a parent's right to control his or her child's upbringing. *Id.* (citing *M.L.B.*, 983 N.E.2d at 586).

[28] Even assuming that Rumfelt is a person qualified to seek grandparent visitation under Ind. Code §§ 31-17-5, we cannot find that the trial court's order denying her petition is clearly erroneous. The record reveals that the trial court heard the testimony of Rumfelt, Great-Aunt, the GAL, Mother, Mother's husband, and Mother's parents and that each of the witnesses was thoroughly examined and cross-examined by counsel for the parties. Rumfelt does not argue that Mother is an unfit parent. The evidence and testimony presented supports the

trial court's findings that Rumfelt has had some contact over the years with Child, Great-Aunt has spent substantially more time with Child than Rumfelt, Rumfelt's more recent contacts with Child have been when she was in Great-Aunt's care, and until 2015 Child did not know Rumfelt was her grandmother. The testimony also supports the court's findings that Great-Aunt has attempted to interfere with the manner of treatment Child was receiving, that Great-Aunt sent a text message to Child telling her that Mother was not taking good care of her and that Child should live with her, that Child harbors resentment toward Great-Aunt for these actions and for these proceedings and does not want to see her, and that, although Great-Aunt assisted Mother in prior years with care of Child, those ties have been broken over the years by the events that have occurred. The trial court found that Rumfelt has not shown that it is in Child's best interest to have grandparent visitation, that Mother has consistently acted in Child's best interest, and the evidence was insufficient to substitute its judgment for that of Mother in regard to Child's contact with her father's family. The evidence supports the conclusion that Mother is a fit parent, and thus special weight must be given to her decision regarding nonparental visitation. The trial court's order does not preclude visitation, and Mother may grant visitation at her discretion.

[29] Based upon the evidence as set forth above and in the record, and in light of our preference for granting latitude and deference to trial judges in family law matters and giving due regard for the opportunity of the trial judge to determine the credibility of the witnesses, we cannot conclude that the judgment of the

trial court is clearly erroneous. *See Wilder-Newland*, 967 N.E.2d at 563-566 (noting that a fit parent's decisions are entitled to special weight and that the trial court's order did not preclude visitation and the mother has complete discretion and the ability to grant visitation on the terms she decides, and affirming the trial court's order declining grandparent visitation where it ultimately concluded that doing so was in the children's best interest consistent with the mother's decision).

[30] As for Mother's request for attorney fees, Ind. Code § 34-52-1-1 provides in part that the court in a civil action may award attorney fees as part of the cost to the prevailing party if it finds that either party brought an action or continued to litigate an action that is frivolous, unreasonable, or groundless or litigated the action in bad faith. Appellate Rule 66(E) provides in part that this Court "may assess damages if an appeal, petition, or motion, or response, is frivolous or in bad faith. Damages shall be in the Court's discretion and may include attorneys' fees." Our discretion to award attorney fees under Ind. Appellate Rule 66(E) is limited to instances when "an appeal is permeated with meritlessness, bad faith, frivolity, harassment, vexatiousness, or purpose of delay." *Thacker v. Wentzel*, 797 N.E.2d 342, 346 (Ind. Ct. App. 2003). We must use extreme restraint when exercising this power because of the potential chilling effect upon the exercise of the right to appeal. *Id.* To prevail on a substantive bad faith claim, the party must show that the appellant's contentions and arguments are utterly devoid of all plausibility. *Id.* Procedural bad faith occurs when a party flagrantly disregards the form and content

requirements of the rules of appellate procedure, omits and misstates relevant facts appearing in the record, and files briefs written in a manner calculated to require the maximum expenditure of time both by the opposing party and the reviewing court. *Id.* at 346-347. We cannot say that Rumfelt's petition was frivolous or that her arguments are utterly devoid of all plausibility and decline to order Rumfelt to pay Mother's attorney fees.

## *Conclusion*

[31] For the foregoing reasons, we affirm the order of the trial court denying Rumfelt's petition for grandparent visitation and deny Mother's request for attorney fees.

[32] Affirmed.

Najam, J., and Kirsch, J, concur.